

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-11-00276-CV

ALFONSO GARCIA                                                                 APPELLANT

V.

CARMEN GARCIA                                                                 APPELLEE

----------

## FROM THE 324TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### Introduction

Appellant Alfonso Garcia appeals the trial court's finding of an informal marriage[2] between him and appellee Carmen Garcia and its division of the community property.  We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

[2]"Informal marriage" is the statutory term for the colloquial term "common-law marriage."

**Factual Background**

The Garcias divorced in 1989 but resumed living together in September 1990. The couple continued living together until November 2008. Throughout this period, Alfonso visited Mexico every year. Around 2003, during one of his visits to Mexico, he met a woman named Maria Sanchez. Alfonso began a relationship with Sanchez but never told Carmen about her.

In February 2008, Alfonso finally confessed to Carmen that he had met someone in Mexico. Alfonso said that Sanchez was pregnant, and he wanted to marry her. Alfonso and Carmen continued to live together. In July 2008, Alfonso went back to Mexico and married Sanchez in a civil court.[3] When he returned, Carmen tried to prevent him from returning to their home, but he told her that he had the legal right to do so. Alfonso continued living with Carmen until November 2008, when he left again for Mexico. Alfonso and Sanchez had a Catholic wedding ceremony on December 31, 2008, in Mexico. Alfonso returned alone to Texas in January 2009, but this time Carmen refused to let him in the house. She filed for divorce on February 26, 2009, on the grounds of adultery and conflict of personalities.

---

[3]Carmen testified that in Mexico, a couple must be married by a civil court before they can have a Catholic wedding.

The couple owned three Texas properties: (1) 3414 Strong Avenue; (2) 1207 Minden Street;[4] and (3) 1006 East Cantey Street. According to testimony, from 1990 to 1996 they lived at the Strong Avenue property. In 1996, the couple purchased the property on Minden Street; after renovations, they moved into that home and resided there from 1999 until their separation in 2008. Alfonso used the house on East Cantey Street as rental property.[5] Carmen testified that Alfonso retained the $500-a-month rental payments. At the time Carmen filed for divorce, Alfonso was living at the Strong Avenue property. Prior to the hearing, Alfonso transferred two of these properties that belonged to the community estate to his nephew, Mario Martinez, without Carmen's permission.

During the trial, there was some dispute regarding property purchased by Alfonso in Mexico. Carmen testified that from 1994 through 1996 Alfonso purchased two lots in Mexico and that he was paying taxes on them. However, Alfonso testified that he had never purchased property in Mexico, but had inherited property from his father that belonged collectively to Alfonso and his siblings.

The trial court found that the Garcias were married on or about September 1, 1990, and ceased living together on or about November 27, 2008. Further, the

---

[4]The Minden address is comprised of three separate lots (1201, 1213, and 1217). The three lots are collectively referred to as 1207 and are approximately an acre and a half with a small two bedroom house located on it.

[5]No testimony was given as to when the East Cantey Street property was purchased.

trial court found that the couple had an informal marriage during the entirety of that time. The trial court found that Alfonso had committed adultery and granted the divorce. It also ordered the properties transferred back to Alfonso and Carmen jointly so that they may be divided at a later hearing.

At the final hearing for the division of the property, the trial court awarded Carmen all of the property associated with the Minden Street address and the property located on East Cantey Street. Alfonso was awarded the property on Strong Avenue. Because there was no proof of any property purchased by Alfonso in Mexico, the trial court found that Alfonso was entitled to any land inherited from his father; however, any land purchased by Alfonso would be awarded to Carmen. Alfonso filed a motion for a new trial arguing that the disproportionate division of property was an abuse of discretion, but he did not challenge the trial court's finding that there was an informal marriage.[6] Alfonso then filed this appeal.

**Discussion**

**A. Common Law Marriage**

In his first issue, Alfonso argues that the evidence is legally and factually insufficient to support the trial court's finding that he and Carmen were informally married. However, in family law cases, the abuse of discretion standard of

---

[6]There is no order on Alfonso's motion for new trial in the clerk's record before us. However, the trial court orally denied the motion at a hearing on the motion on July 14, 2011.

review overlaps with the traditional sufficiency standard of review; thus, legal and factual insufficiency are not independent reversible grounds of error but are relevant factors in assessing whether the trial court abused its discretion. *Neyland v. Raymond*, 324 S.W.3d 646, 649 (Tex. App.—Fort Worth 2010, no pet.); *Boyd v. Boyd*, 131 S.W.3d 605, 611 (Tex. App.—Fort Worth 2004, no pet.).

In a bench trial in which no findings of fact or conclusions of law are filed, the trial court's judgment implies all findings of fact necessary to support it. *Pharo v. Chambers County*, 922 S.W.2d 945, 948 (Tex. 1996); *In re Estate of Rhea*, 257 S.W.3d 787, 790 (Tex. App.—Fort Worth 2008, no pet.). But when a reporter's record is filed, these implied findings are not conclusive, and an appellant may challenge them by raising issues challenging the sufficiency of the evidence. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002); *Estate of Rhea*, 257 S.W.3d at 790.

Accordingly, to determine whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we determine first whether the trial court had sufficient evidence upon which to exercise its discretion, and then whether the trial court erred in its application of that discretion. *Boyd*, 131 S.W.3d at 611. The applicable sufficiency review comes into play with regard to the first question. *Id*. We then proceed to determine whether, based on the elicited evidence, the trial court made a reasonable decision. *Id*.; *see also Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985) (stating that, to determine whether a

5

trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable), *cert. denied*, 476 U.S. 1159, 106 S. Ct. 2279, (1986).

### 1. Legal and Factual Sufficiency of the Evidence

Evidence is legally insufficient only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable fact finder could and disregard evidence contrary to the finding unless a reasonable fact finder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the

6

overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). When conducting a factual sufficiency review, a court of appeals must not merely substitute its judgment for that of the trier of fact. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The trier of fact is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *Id*.

Under section 2.401 of the family code, an informal marriage is established when (1) there is an agreement to be married; (2) the couple is living together as husband and wife; and (3) they are representing to others that they are married. Tex. Fam. Code Ann. § 2.401(a)(2) (West 2006). An informal marriage does not exist until all three elements occur. *Flores v. Flores*, 847 S.W.2d 648, 650 (Tex. App.—Waco 1993, writ denied) (holding that all three elements can come about at different times, but until all three occur, there is no informal marriage).

**2. Agreement to be Married and Living Together as Husband and Wife**

To establish an agreement to be married, "the evidence must show the parties intended to have a present, immediate, and permanent marital relationship and that they did in fact agree to be husband and wife." *Small v. McMaster*, 352 S.W.3d 280, 283 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (citing *Winfield v. Renfro*, 821 S.W.2d 640, 645 (Tex. App.—Houston [1st Dist.] 1991, writ denied)). The agreement to be married may be established by

7

direct or circumstantial evidence, and the testimony of one of the parties to the marriage constitutes direct evidence that the parties agreed to be married. *See Eris v. Phares*, 39 S.W.3d 708, 714 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (citing *Collora v. Navarro*, 574 S.W.2d 65, 70 (Tex. 1978)). Evidence of an agreement may be inferred from cohabitation and representations by the parties. *Id.*

Alfonso argues that Carmen unilaterally intended to be informally married to him once they resumed living together in 1990. He claims that he and Carmen were divorced on January 11, 1989, and prior to the current divorce proceeding, they were living together, but not as husband and wife. At trial, Alfonso repeatedly stated that he was not married to Carmen, that they were already divorced, and that their current relationship was not a marriage. When he was asked if he was married to Carmen, he responded, "No. Legally, I'll say no." However, when asked if he and Carmen slept together in the same room and were living together as husband and wife, Alfonso answered, "Yes."

Carmen testified that she was married to Alfonso beginning in September 1990 when they resumed living together. She provided evidence that they had cohabitated for eighteen years and that they represented to third parties that they were married by filing joint tax returns and signing mineral leases as husband and wife. An inference to Carmen and Alfonso's agreement to marry can be evidenced by their living together and their representations to others from 1990 until 2008. *See Eris*, 39 S.W.3d at 714. Carmen also testified that Alfonso told

8

her grandchildren that he and Carmen were already married and did not need to be married again in the church. Carmen's testimony is direct evidence that the couple agreed to be married and lived together as husband and wife. *See id*. Alfonso corroborated her evidence when he answered affirmatively that they lived together as husband and wife. *See* Tex. Fam. Code Ann. § 2.401(a)(2). We therefore hold that there is evidence that the couple agreed to be married. *See, e.g.*, *In re Marriage of Hallgarth*, No. 07-01-0013-CV, 2001 WL 574833, at *2 (Tex. App.—Amarillo May 29, 2001, no pet.) (mem. op., not designated for publication) (holding that testimony by wife that husband asked her to get married together with "the evidence concerning their 15 year period of cohabitation, their use of the same last name, their representations to third parties that they were married, and the statement to hospital officials by [the husband] that [the wife] was his wife to gain her admission into the hospital" was more than a scintilla of evidence that they had agreed to be married).

### 3. Representation to Others as a Married Couple

The statutory requirement of "represent[ing] to others" is synonymous with the old judicial requirement of "holding out to the public." *Winfield*, 821 S.W.2d at 648. "Holding out" may be established by the conduct and actions of the parties; spoken words are not necessary to establish representation as husband and wife. *Id*. Carmen argues that the evidence of their cohabitation and representation to others as husband and wife is proof that they held themselves out to the public as married. The couple lived together for approximately

9

eighteen years, Alfonso assisted Carmen in adopting and raising her grandchildren, Alfonso and Carmen were registered as a family at their church, and the couple was listed as husband and wife at the children's school.

The couple also maintained a joint checking account to which both parties had full access, and they both deposited and withdrew funds from the account. Although Carmen did not provide any documentary evidence of tax returns between 1990 and 2003, she did provide evidence of a 2003 and 2007 tax return, on which she and Alfonso were listed as married. She explained that their return was audited in 2003 and that she did not have all the returns before that. Carmen testified that they filed their taxes jointly the entire time they lived together, and Alfonso confirmed that they filed joint tax returns in 2007 and 2008. In 2008, the couple received a tax refund which was issued to them as husband and wife and was deposited in the joint checking account. Further, the couple signed a mineral lease for one of the properties and on it listed themselves as husband and wife.

Alfonso asserts that under *Flores*, his "statements" to the government that he was married were strictly for self-serving purposes. *Flores* states:

> Occasional references to "my wife" or "my husband" do not prove a tacit agreement to be married without corroboration. If the statement is made in a self-serving context—such as a deponent's reference to his marital situation in order to show a stable family relationship, an application to a lender by one seeking a loan, or by the person seeking to admit himself or herself to a hospital—it may not have great weight.

847 S.W.2d at 652.

10

Alfonso claims that he only filed jointly because he would have to pay less in taxes. Thus, under *Flores*, his statements to the government should not have much weight in determining whether he and Carmen were married. *See Flores*, 847 S.W.2d at 652. But *Flores* also states that "a forthright assertion of marriage with the consequences of liability—such as . . . the filing of [a] joint income tax return—may be far more probative of such an agreement." *Id*. Alfonso and Carmen filed joint tax returns and signed an oil, gas, and mineral lease as husband and wife. These assertions, with their consequences of liability, provide strong corroboration that Alfonso and Carmen were married. *Flores* is further distinguishable because in that case, the wife did not corroborate her claim of marriage with any evidence. *Id.* ("Occasional references to 'my wife' or 'my husband' do not prove a tacit agreement to be married *without corroboration.*") (emphasis added). In this case, Carmen corroborated Alfonos's representations with evidence such as the tax returns and the lease.

### 4. Legal Presumption of Validity of Most Recent Marriage

Alfonso claims that the strongest evidence that he did not consider himself married to Carmen was his marriage to Sanchez in Mexico on December 31, 2008. The Texas Family Code provides that the most recent marriage is presumed valid against each prior marriage until the person who asserts the validity of the prior marriage proves that validity. Tex. Fam. Code Ann. § 1.102 (West 2006). When one party celebrates a ceremonial marriage with another person, without obtaining a divorce, that marriage tends to discredit the first

11

relationship and its validity. *Estate of Claveria v. Claveria*, 615 S.W.2d 164, 165 (Tex. 1981). Still, the "circumstances of each case must be determined based upon its own facts," and the presumption is not conclusive, but can be rebutted by evidence that negates dissolution of the previous marriage. *See id*. at 166; *Bailey-Mason v. Mason*, 122 S.W.3d 894, 898 (Tex. App.—Dallas 2003, pet. denied). Informal marriage, like any other marriage, may be terminated only by death or a court decree; once the marriage exists, a spouse's subsequent denials of the marriage do not undo the marriage. *See Claveria*, 615 S.W.2d at 167. Once evidence is presented that negates the previous marriage's dissolution, the fact finder must determine whether the presumption of validity has been overcome. *Bailey-Mason*, 122 S.W.3d at 898.

Carmen produced evidence that she and Alfonso filed taxes together, signed mineral leases as husband and wife, and had a joint bank account. Carmen also testified that Alfonso lived with her after he had been married to Sanchez by a civil court in July 2008 and that he tried to come back to live with her in January 2009, six weeks after he had ceremonially married Sanchez. Further, Alfonso testified that he never planned on living with Sanchez in Mexico, did not tell Carmen about Sanchez for several years until Sanchez became pregnant in 2008, and was leading a "double life" because he did not agree with Carmen allowing her son to make decisions about Carmen's finances. When testifying about his marriage in Mexico to Sanchez, he was asked,

Q. Do you think that what you did is okay?

12

A. I know it is not.

Q. Why?

A. I have my reasons.

He testified that he transferred title of the properties to his nephew because he was afraid that if Carmen divorced him again, she would leave him with nothing.[7]

More than a scintilla of evidence exists that Alfonso and Carmen had entered into an informal marriage. *See Uniroyal*, 977 S.W.2d at 334. And viewing all of the evidence, we cannot say that the evidence supporting the finding is so weak, or the weight of the contrary evidence so overwhelming, that the trial court's ruling should be set aside. *See Pool*, 715 S.W.2d at 635. Because Carmen demonstrated that she and Alfonso had an informal marriage and that the marriage had not been terminated when Alfonso married Sanchez,

---

[7]Despite denying that this trial was a divorce proceeding, he stated twice that he did not want Carmen taking the property in a divorce. He was asked,

> Q. Tell me again why you transferred the title on the East Cantey property to your nephew, Mario Martinez.

> A. Because in 1989, when she got divorced, she left me without anything; without a car, without nothing.

And later, he was asked again,

> Q. My understanding, and correct me if I'm wrong, that you transferred the property to [your nephew] because you were afraid that Mrs. Garcia would leave you with nothing if she got a divorce; is that correct?

> A. It is correct, because she did once.

13

the trial court was free to find that Carmen had overcome the presumption of validity of Alfonso's ceremonial marriage to Sanchez. *See Bailey-Mason*, 122 S.W.3d at 898. The evidence that Alfonso knew his marriage to Sanchez was not right, that he never intended to live with her, and that he returned to Carmen even after marrying Sanchez in a church is both legally and factually sufficient to support the trial court's finding that the presumption of validity of the ceremonial marriage was overcome. The evidence is also legally and factually sufficient to support the trial court's finding that the Garcias were informally married. Thus, the trial court did not abuse its discretion by finding an informal marriage between Alfonso and Carmen beginning in September 1990. *See Boyd*, 131 S.W.3d at 611. We overrule Appellant's first issue.

## B. Property Division

In his second issue, Alfonso claims that the trial court abused its discretion by dividing the property in the manner that it did because: (1) there was insufficient evidence to show whether the nature of the property was community or separate; and (2) the 72% to 28% division of the marital estate division was not justified by any guiding principle.

A trial court has broad discretion in making its "just and right" division of the marital estate. Tex. Fam. Code Ann. § 7.001 (West 2006); *Murff v. Murff*, 615 S.W.2d 696, 698–99 (Tex. 1981). Absent a clear abuse of discretion, we will not disturb that division. *Bell v. Bell*, 513 S.W.2d 20, 22 (Tex. 1974); *Boyd v. Boyd*, 67 S.W.3d 398, 406 (Tex. App.—Fort Worth 2002, no pet.).

14

## 1.  Community Property vs. Separate Property

Under sections 3.001 and 3.002 of the family code, community property is the property, other than any separate property, acquired by either spouse during the marriage; separate property consists of property owned or claimed by the spouse prior to marriage.  Tex. Fam. Code Ann. §§ 3.001(1), 3.002 (West 2006).  Texas Family Code section 3.003 states that there is a presumption that property acquired by either spouse during marriage is community property, and the degree of proof necessary to establish that property is separate property is clear and convincing evidence.  *Id*. § 3.003 (West 2006).  When the character of the property is in doubt, Texas courts have held in favor of the community estate.  *Ellebracht v. Ellebracht*, 735 S.W.2d 658, 659 (Tex. App.—Austin 1987, no writ).

Alfonso argues that there was no evidence of when the properties were purchased; thus, the trial court abused its discretion in finding that the properties were community property subject to division.  However, Alfonso testified that as a result of his first divorce from Carmen, he was left without anything.  He also did not present any evidence to rebut Carmen's testimony about the purchase of the properties during their marriage.  To discharge the burden imposed by section 3.003 of the family code, Alfonso must have traced and clearly indentified the property that he claimed was separate.  *See Tarver v. Tarver*, 394 S.W.2d 780, 783 (Tex. 1965) (holding that the statute imposes the burden on one asserting property is not community to prove the contrary by satisfactory evidence).  Alfonso did not present any evidence that the properties were not community

property, nor did he plead that he owned separate property. Alfonso failed to discharge his burden under the statute and thus did not overcome the presumption of community property. *See* Tex. Fam. Code Ann. § 3.003.

### 2. Marital Estate Division

Under section 7.001 of the family code, the trial court must divide the marital estate in a manner the trial court deems just and right while considering the rights of both parties. *Id*. § 7.001. In making an equitable division, the court should consider all of the surrounding circumstances, and the division need not be equal as long as it is not so disproportionate as to be inequitable, and the circumstances justify awarding more than one-half to one spouse. *Naguib v. Naguib*, 137 S.W.3d 367, 378 (Tex. App.—Dallas 2004, pet. denied). Some of the factors the trial court can consider in dividing the marital estate include the spouses' ages, earning power, capacities, and abilities; fault—such as adultery or cruelty—in the breakup of the marriage; relative financial condition and obligations; fraud on the community and wasting of community assets; and the nature of the property. *See Neyland v. Raymond*, 324 S.W.3d 646, 651 (Tex. App.—Fort Worth 2010, no pet.); *Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 820–21 (Tex. App.—Fort Worth 2007, no pet.), *disapproved of on other grounds by Iliff v. Iliff*, 339 S.W.3d 74, 83 (Tex. 2011).

In the divorce decree, the trial court awarded Alfonso the Strong Avenue property and his car and truck. The trial court awarded Carmen the Minden and East Cantey properties, her car, and

16

[a]ny and all community property in Mexico, save and except all separate property inherited by [Alfonso] from his father, except for that property in [Alfonso's] father's name that may have been wrongfully transferred to [Alfonso's] father by [Alfonso] with intent to defraud [Carmen] and deprive her of such community property.

The Strong Avenue property was estimated to be worth $27,800. The Minden property was estimated to be worth about $38,000. The East Cantey property was estimated to be worth $20,600. There was no testimony regarding the value of the cars; however, both parties acknowledged that the truck was not in working condition.[8]

Carmen requested a disproportionate share of the property because Alfonso committed adultery and transferred properties belonging to the community estate to a relative to prevent Carmen from claiming them in the divorce. Carmen's other grounds in her divorce petition were Alfonso's conduct that led to the breakup of the marriage; age of the spouses; earning power, business opportunities, capacities and abilities of the spouses; need for support; and attorney's fees to be paid.

Alfonso testified that he had a relationship with Sanchez since 2003, and he did not tell Carmen about his relationship until February 2008 when he found out Sanchez was pregnant. Alfonso married Sanchez in December 2008 before he was separated from Carmen, which led to the breakup of the marriage.

---

[8]There was also no testimony regarding attorney's fees, but in the divorce decree, the trial court ordered that Carmen and Alfonso be responsible for their respective attorney's fees.

17

Further, there was testimony that Alfonso committed fraud on the community estate when he transferred the property on Strong Avenue and East Cantey Street to his nephew so Carmen could not claim them. Alfonso was ordered to have the properties transferred back prior to the subsequent hearing dividing the property. According to Carmen's testimony, Alfonso also received approximately $5,000 from rental of the East Cantey property that he did not deposit in the joint account. Carmen has two granddaughters that she is raising, and prior to their divorce, Alfonso assisted in their care. There was also testimony regarding the jobs that Carmen and Alfonso held and the wages that they earned. Carmen testified that her job was the main source of income for the family and that she had worked consistently for two and a half years at the same job, earning about $21,000 a year. She testified that Alfonso never kept a job for very long and would frequently quit positions or get laid off. Alfonso testified that he made ten dollars an hour at his last job, which he held for three weeks. Before that, he earned twelve dollars an hour. He once held a job for three months working for fourteen dollars an hour, but he never held a job for longer than three months.

Alfonso claims that the division of community property was 72% to Carmen and 28% to him. To arrive at those percentages, Alfonso necessarily had to include the value of any property in Mexico that he had purchased. However, Alfonso repeatedly denied the existence of any property in Mexico.[9] The division

---

[9]As the trial court noted, if there is no purchased property in Mexico, it does not harm Alfonso to have it awarded to Carmen.

18

of the Texas properties, without including the value of the automobiles and other personal property, is closer to 68% to Carmen, and 32% percent to Alfonso.

The trial court had sufficient evidence to exercise its discretion in dividing the couple's property. *See Neyland*, 324 S.W.3d at 649. Carmen testified that her job was the couple's major source of income, despite the fact that Alfonso, had he maintained consistent employment, had a greater earning capacity, and Alfonso did not dispute that he changed jobs, at minimum, every three months. *See Hailey v. Hailey*, 176 S.W.3d 374, 382 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (holding that 60/40 division of property was not inequitable when, among other things, wife earned more income than husband during their marriage). Carmen testified that she had no separate property, and Alfonso testified that he had inherited, along with his siblings, land from his father in Mexico. *See Abernathy v. Fehlis*, 911 S.W.2d 845, 848 (Tex. App.—Austin 1995, no writ) (noting husband's relative financial condition, including inheritances, in upholding an unequal division of property in favor of wife). Further, Alfonso admitted that he transferred title of community property to his nephew to prevent Carmen from getting at the properties in a divorce action. *See In re Marriage of Notash*, 118 S.W.3d 868, 872 (Tex. App.—Texarkana 2003, no pet.) ("Because a spouse has an adequate remedy through disproportionate division of the community estate, fraud on the community is properly considered when dividing a community estate.").

Based on the evidence presented at trial, the trial court did not abuse its discretion by dividing the community property as it did. *See Naguib*, 137 S.W.3d at 378; *Neyland*, 324 S.W.3d at 651. We overrule Alfonso's second issue.

## Conclusion

Having overruled Appellant's two issues, we affirm the trial court's judgment.

LEE GABRIEL
JUSTICE

PANEL: MCCOY, MEIER, and GABRIEL, JJ.

DELIVERED: August 2, 2012